IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|                                | *  |                           |
| ------------------------------ | -- | ------------------------- |
| CAROLE McCREADY                | *  |                           |
| Plaintiff,                     | *  |                           |
| v.                             | *  | Civil Case No. RDB 05-382 |
| STANDARD INSURANCE COMPANY,    | *  |                           |
| Defendant.                     | *  |                           |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Pending before this Court are Cross Motions for Summary Judgment filed by Plaintiff Carole McCready ("Plaintiff" or "McCready") and Defendant The Standard Insurance Company ("Defendant" or "Standard").  On February 8, 2005, Plaintiff brought this action against Standard pursuant to the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001, *et. seq.*[1]  Plaintiff alleges that Defendant improperly denied her claim for long-term disability benefits under Group Benefit Policy No. 641252-A LTD ("Policy" or "Plan").  She seeks review of Defendant's administrative decision to deny benefits under this Policy.  Ultimately, Plaintiff asks this Court to award her long-term disability benefits.

On June 13, 2005, Defendant filed the Motion for Summary Judgment now before the Court.  On June 14, 2005, Plaintiff filed an Opposition to Defendant's Motion for Summary Judgement and a Cross Motion for Summary Judgment.  On August 1, 2005, Defendant filed a Reply to Plaintiff's Opposition and a Response to Plaintiff's Cross Motion for Summary

---

[1] A beneficiary of an employee benefit plan may bring an action "to recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).

Judgment.  On that same day, this Court granted Defendant's Motion for Protective Order and

denied Plaintiff's request for discovery in this case.[2]

     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.  The parties

have fully briefed the issues and submitted the full administrative record to the Court.  No

hearing is necessary on these motions.  *See* Local Rule 105.6 (D. Md. 2004).  For the reasons

stated below, Defendant's Motion for Summary Judgment is GRANTED and Plaintiff's Motion

for Summary Judgment is DENIED.

BACKGROUND

     Plaintiff, Carole McCready, worked for Piper Rudnick, LLP ("Piper") for thirteen and

one-half years as a legal secretary.  (Compl. ¶ 7.)  McCready left Piper on April 16, 2002,

(Compl. Ex. 9. p. 2.), because of numerous ailments, including:

> uncontrolled diabetes mellitus Type-2; moderate obstructive lung disease with a
> severe defect in diffusing capacity; emphysema; hypertension; hypothyroidism;
> obesity; asthma; extreme fatigue; and (sic) osteoarthritis.

(Compl. ¶ 10.)  When initially out of work, McCready received short-term disability benefits.

(Letter to Steve Thompson, June 25, 2002, STND-00064.)[3]  McCready was eligible to apply for

long-term disability benefits to begin February 10, 2003.  (*Id.*)

     On February 2, 2003, McCready filed for long-term disability benefits through

---

[2]  Plaintiff submits in her Opposition to Defendant's Motion for Summary Judgment and in her Cross
Motion for Summary Judgment that she should be allowed to engage in further discovery before a decision is made
on the merits of the claim.  However, this Court has already considered the issue and declines Plaintiff's invitation
to reconsider its August 1, 2005 ruling.  It is well established that review of an administrator's decision for
reasonableness is based on the evidence before the administrator at the time of determination.  *See Quesinberry v.
Life Ins. Co. of North America*, 987 F.2d 1017, 1025 (4th Cir. 1993) (noting that generally "the district court should
only look at the evidence that was before the plan administrator or trustee at the time of the determination."); *see
also Elliott v. Sara Lee Corp.*, 190 F.3d 601, 609 (4th Cir. 1999).

[3]  References to "STND" denote bates labeled pages in Standard's claim file, sometimes referred to as the
administrative record, provided to this Court by Standard.

Defendant, The Standard Insurance Company ("Standard").  (Compl. Ex. 9. p. 2.)  After initial

review of her file, Standard determined McCready was not eligible for long-term disability under

the Plan.  (Compl. Ex. 7.)  On McCready's request, Standard conducted a second review of her

file and reaffirmed its earlier decision to deny benefits.  (June 4, 2003 Letter to Carole

McCready, STND-00272).  On independent review by Standard's Quality Assurance Unit,

denial of McCready's benefits was reaffirmed.  (Compl. Ex. 9.)

I.  Essential Definitions Under the Long-Term Disability Plan

Standard based its decision to deny benefits under the Plan on the specific definition of

two essential terms: "Own Occupation" and "Material Duties."  (Compl. Ex. 9.)  Under the Plan,

McCready would meet the definition of "Disabled" for purposes of long-term disability if she

were disabled from her "Own Occupation."  (Compl. Ex. 6 p. 6.)  "Own Occupation" is defined

as:

> any employment, business, trade, profession, calling or vocation that involves
> Material Duties of the same general character as your regular and ordinary
> employment with the Employer.  Your Own Occupation is not limited to your job
> with your Employer.

(*Id.*)  The Plan further defines "Material Duties" as:

> the essential tasks, functions and operations, and the skills, abilities, knowledge,
> training and experience, generally required by employers from those engaged in a
> particular occupation.

(*Id.*)

II.  Determination of McCready's Claim

At the conclusion of three levels of review, Standard determined that McCready did not

qualify as "Disabled" as to her "Own Occupation" since she could fulfill the "Material Duties"

required by the general economy for legal secretaries.  (Compl. Ex. 9.)  As described in more

3

detail below, Standard conducted an initial review of McCready's claim in the spring of 2003

based on the information it had received from her in connection with her initial application for

long-term disability benefits.  After Standard denied her claim based on this information,

McCready submitted additional medical records and Standard re-reviewed its initial decision.

Based on this information, Standard's decision to deny McCready's claim remained unchanged.

Standard automatically submitted McCready's claim information to a separate department at

Standard, the Quality Assurance Unit ("QAU"), for review.  At this stage, McCready submitted

additional information to Standard that she had previously failed to provide.  QAU examined all

the information provided by McCready and determined that she did not qualify for long-term

disability.

To determine McCready's eligibility for long-term disability benefits under the Plan,

Standard had to examine two main elements.  First, Standard had to determine McCready's

"Own Occupation" under the Plan.   Second, to determine if McCready qualified as "Disabled"

from her "Own Occupation," Standard evaluated her medical history as provided by her various

physicians: Dr. Francis Lee, Endocrinologist; Dr. Martin Clouse, Primary Care; Dr. Cynthia

Soriano, Pulmonologist; Dr. Michael Scheerer, Orthopedic Surgeon; Dr. Richard Scholz,

Ophthalmologist.  (Compl. Ex. 9. p. 3-8.)  As previously mentioned, McCready was providing

information to Standard on a rolling basis throughout its review process of her application.

A.  Overview of Standard's Three Levels of Review of McCready's Claim

On April 4, 2003, McCready received her first denial of long-term disability benefits by

Standard based on her February 2, 2003 claim application.  (Compl. Ex. 7. p. 1; STND 00244-

247.)  Standard denied McCready's claim for benefits finding that she could work in a secretarial

position, although perhaps not in her previous job at Piper.  (*Id.*)  Specifically, Standard did not

find a medical condition that indicated McCready would not be able to perform sedentary or light work as defined by the Department of Labor's Dictionary of Occupational Titles ("DOT"). This assessment was based on the January 31, 2003 statements by Dr. Francis Lee, Dr. Martin Clouse, Dr. Michael Scheerer, and Dr. Richard Scholz.  At this stage, McCready had not provided any type of detailed job description from Piper.[4]

In denying McCready's initial claim, Standard noted that McCready could request a review and submit additional information supporting her inability to return to work.   Standard also noted that a medical professional not previously consulted would conduct a review if necessary.  In response, McCready requested the review and submitted additional information from Dr. Lee, dated April 17, 2003.  (Compl. Ex. 8.)  She did not provide any information concerning her specific duties at Piper at this stage.

Standard then conducted a review of its primary decision to deny McCready's request for long-term benefits.  Based on its review of the information submitted, Standard affirmed its original denial of McCready's claim. (June 4, 2003 Letter to Carole McCready, STND-00272). Standard thereafter released McCready's file for an independent review by the QAU that provides review of benefit determinations independently from the initial determination process. (*Id.*; Compl. Ex. 9. p. 1.)

McCready provided additional information to Standard at this time, including a detailed description from Piper of her duties as a legal secretary at the firm.  (June 4, 2003 Fax to Standard from Piper, STND 00280.)  After reviewing her file, Standard's QAU sent McCready a

---

[4]  This initial determination referenced several factors in the denial of long-term benefits, including improvement in her diabetes and elimination of pain medication.  (*See* April 4, 2003 Letter to McCready, STND 00244-247.)  Furthermore, Standard noted increased physical activity and decreased complaints with respect to shortness of breath.

letter, on July 25, 2003, indicating that it was denying her request for long-term disability

benefits.  (*See* July 25, 2003 Letter to McCready, STND 00329-339.)  In reaching its decision,

the QAU reviewed all available medical and vocational information as well as correspondence

regarding the denial of the original claim.  While the review considered the medical records

provided by McCready's doctors, it indicated that Dr. Clouse's and Dr. Lee's statements that

McCready was not able to work were not determinative of disability under the Plan.  Rather, the

review was to look at the medical records as a whole and consider those "in context with the

provisions of the group policy."  (*Id.* at STND 00331.)

    The QAU found McCready's mobility limitations to be insufficient to render her

"Disabled" under the Plan.  The QAU noted that Dr. Lee's June 18, 2003 assessment of

McCready's maximum walking distance as 100 feet was inconsistent with reports in February,

2002 indicating that she could walk 200 to 300 feet.  (*See id.*)  The QAU also determined that

McCready was not disabled as her gait and balance were consistently normal. (*Id.*)  Moreover,

even if limited to walking 100 feet per day, the QAU determined that McCready was not

"Disabled" from her "Own Occupation" as found in the general economy because it is a

sedentary occupation.  (*Id.*)

    The QAU also found McCready's diabetic neuropathy insufficient for "Disability."  The

QAU noted that although "numbness, tingling and pain in hands or feet" was noted throughout

McCready's medical records since August 1, 2001, McCready continued to work with those

symptoms until April of 2002.  (*Id.*)  The QAU also found significant that it was not until after

McCready stopped work and was denied disability benefits that Dr. Lee noted that numbness,

tingling and pain was "severe."  (*Id.*)

    The QAU determined that McCready's pain was also insufficient to render her

"Disabled." The QAU found that although McCready experienced sustained pain, moderate levels of pain are not incompatible with work. (*Id.*) As the records noted normal strength, gait and balance as well as lack of "distress," the review determined McCready was not so impaired in her ability to perform work as to be "Disabled" from sedentary work. (*Id.*)

As to pulmonary capacity, the QAU noted McCready's ongoing pulmonary disease and use of medication to alleviate her conditions. (*Id.*) The QAU also noted that at times McCready may have been significantly limited during upper respiratory infection or "flare" of the disease. (*Id.*) However, the QAU determined that such limitations were short in period and not reflective of a long-term "Disability" through any continuous period. (*Id.*)

The QAU also found that McCready's diabetes did not prevent her from working. The QAU noted that McCready's blood sugars improved starting October 2001. (*Id.*) The QAU acknowledged that McCready's diabetes was not under "optimal control," but that the condition had improved prior to leaving work. The QAU did not consider return to work something that would cause McCready's diabetic condition to deteriorate. (*Id.*)

Considering McCready's other ailments, the QAU determined that they were either controlled by medication or not an ongoing medical complaint that would preclude work. (*Id.*) Morever, all the conditions existed well before McCready actually left work - she had worked for many months with many of the complained of conditions. (*Id.*) As such, the QAU concluded that there was insufficient evidence that McCready was "Disabled" under the Plan either before or after she stopped working at Piper. The QAU also concluded that McCready's medical records were consistent with that determination and there were no notable changes in McCready's conditions in the period before April 16, 2002, or after. (*Id.*)

B. "Material Duties" of McCready's "Own Occupation"

To determine if McCready was "Disabled" under the Plan, Standard defined the "Material Duties" of McCready's "Own Occupation."  At the first two levels of its review, Standard did not have any job description from McCready's former employer, Piper.  Therefore, it relied on information contained in the Department of Labor's Dictionary of Occupational Titles ("DOT") and noted that McCready's occupation as a Legal Secretary was sedentary.  (*See* STND 00245; STND 00270-271.)  It was not until QAU conducted its review in mid-summer 2004 that it had any information from Piper concerning McCready's job description.  (*See* STND 00276-280.)  Once Standard reviewed this information from Piper it examined the job description as part of its analysis of McCready's claim.

At the QAU stage, to define the "Material Duties" of a Legal Secretary, Standard considered the detailed job description that Piper submitted on McCready's behalf, which stated:

> client contact, including receiving phone calls, sending written correspondence, walking throughout the office to retrieve and distribute information; interaction with judicial organizations by telephone and correspondence; manage schedules and travel; manage and distribute monthly bills, requiring the ability to confer with lawyers and staff in various offices and departments; maintain client information; maintain client files throughout the building; assign document preparation to staff throughout the building; prepare and proofread documents requiring distribution and attention to detail; manage incoming mail and communications and distribute when appropriate.

(Compl. Ex. 4.)  Standard compared Piper's description to the definition of Legal Secretary duties in the general economy, which is described by the DOT as follows:

> Prepares legal papers and correspondence of legal nature, such as summonses, complaints, motions, and subpoenas, using typewriter, word processor, or personal computer.  May review law journals and other legal publications to identify court decision pertinent to pending cases and submit articles to company officials.

8

(Department of Labor Occupational Titles, 1999 - 201.362-010, Legal Secretary).[5]

Standard's Vocational Case Manager, Amy Williams, MA, CRC, who was involved in the QAU's analysis of McCready's claim, determined that the job description Piper provided was in excess of a Legal Secretary position in the general economy, as described by the DOT. (Memo from Amy Williams, STND-00301).  Ms. Williams also determined that McCready performed duties in excess of the DOT's definition of Legal Secretary and would be better considered as a Legal Secretary/Secretary under the DOT.  (*Id.*)  The material duties listed by the DOT for Secretary are:

> [s]chedules appointments, gives information to callers, takes dictation... [r]eads and routes incoming mail... [l]ocates and attaches appropriate file to correspondence... transcribes notes on typewriter, or transcribes from voice recordings... [c]omposes and types routine correspondence.  Files correspondence and other records.  Answers telephone... [g]reets visitors, ascertains nature of business, and conducts visitors to employer or appropriate person... [m]ay make copies... [m]ay prepare outgoing mail...

(Department of Labor Occupational Titles, 1999 - 201.362-030, Secretary).[6]

The essential difference between Piper's definition of McCready's material duties and Standard's determination of her "Material Duties" is in the activity level required for her occupation.  Piper described McCready's material duties as requiring mobility and walking approximately 80% of the work-day.  (Compl. Ex. 4.)  The DOT definitions provide rankings of the relative strength required "for average, successful work performance."  (Department of Labor Occupational Titles, 1999, Appendix IV. Physical Demands - Strength Rating).  For each job title, the DOT evaluates the relative strength required.  DOT definitions of Legal Secretary and

---

[5] Although the Department of Labor's Occupational Titles is printed in a 1999 edition, the definition of Legal Secretary has not been updated since 1982.

[6] The definition of Secretary was last updated by the Department of Labor in 1989.

Secretary are classified as "Sedentary Work."  (Department of Labor Occupational Titles, 1999).

"Sedentary Work" requires the following types of activity:

> Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time.  Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

(Department of Labor Occupational Titles, 1999, Appendix IV. Physical Demands - Strength Rating).

When Standard evaluated McCready's "Own Occupation," it used the DOT definition of "Sedentary Work" to evaluate if McCready was "Disabled" under the Plan.  Ms. Williams opined that the amount of standing and walking described in Piper's job description was "well in excess of what would commonly exist in a classically *Sedentary* secretarial position" and would fall into a description of "Light" work as defined by the DOT.  (*Id.* at p. 2.)  Ms. Williams then determined that it was appropriate to consider McCready's "Own Occupation" as consistent with the general economy's definition of the occupation as found in the DOT, and therefore considered McCready's "Own Occupation" as sedentary.  (*Id.*)  As a result, Standard held that McCready's "Material Duties" did not require frequent walking or standing and the more active duties described by Piper were not "essential tasks ... generally required by employers from those engaged" as a Legal Secretary.  (Compl. Ex. 9. p. 3.)

Standard determined that the DOT definition of material duties for Legal Secretary and Secretary were appropriately used under the Plan because "Own Occupation" was not limited to McCready's specific job with Piper.  (*Id.*)  Rather, the Plan permitted Standard to look broadly at general employer expectations for a Legal Secretary when defining "Material Duties" for

purposes of determining whether McCready was disabled.  (*Id.*)  Accordingly, Standard found

that McCready was able to sufficiently perform a large part of the sedentary "Material Duties" of

a Legal Secretary, and was therefore not "Disabled" from her "Own Occupation."  (*Id.*)

     C.  Review of McCready's Medical History

     Carole McCready was 58 years old when she filed her claim with Standard for long-term

disability benefits.  (Compl. Ex. 2.)  McCready was diagnosed with diabetes in December of

1998 when she was hospitalized with elevated blood sugars.  (*Id.*)  She was later discharged and

placed on insulin.  (*Id.*)  On April 16, 2002, McCready decided to leave her position with Piper

because of diabetes and diabetic neuropathy.  (Compl. Ex. 9.)

     On February 2, 2003, McCready filed her original claim for long-term disability through

Standard.  (Compl. Ex. 5.)  Attached to that claim, McCready included a medical report from Dr.

Francis Lee, Endicronologist.  (*Id.*)   Dr. Lee stated that McCready should have stopped working

at year end 2001 because of her "severe painful neuropathy and poorly controlled diabetes."

(*Id.*)  Dr. Lee noted that the severe pain in McCready's legs would only improve slowly, over

several years.  (*Id.*)

     On June 12, 2003, in response to the denial of her original long-term disability claim,

McCready submitted an additional report from Dr. Lee.  (Compl. Ex. 2.)  In addition, Standard

requested a complete medical record from McCready's various treating physicians to assist in

the review.  (Compl. Ex. 9.)  Standard eventually obtained medical records from Dr. Martin

Clouse, McCready's primary care physician, Dr. Cynthia Soriano, her pulmonologist, Dr. Micael

T. Scheerer, her orthopedic specialist, and Dr. Richard Scholz, her opthomologist, and additional

evaluations from Dr. Lee, her endocrinologist.  (*Id.*)

     i.  Assessments by McCready's Treating Physicians

On Standard's request, Dr. Lee provided medical records dating from June 22, 2001 to July 1, 2003.  (*Id.* at p. 6-8.)  Overall, those records note on-going issues with diabetes and pulmonary function.  (*Id.* at p. 6.)  Dr. Lee noted numbness, tingling and pain in McCready's hands and feet.  (*Id.*)  The records also indicate that McCready has reduced reflexes.  (*Id.*)  However, Dr Lee indicated that McCready possessed normal strength, gait and balance.  (*Id.*)

On April 15, 2003, Dr. Lee asserted that McCready experienced several specific health problems.  Dr. Lee suggested that McCready was unable to walk beyond 100 feet because of her painful diabetic neuropathy.  (*Id.*)  McCready's ability to use her hands and fingers is also limited by her diabetic neuropathy.  (Compl. Ex. 2.)  Dr. Lee described her manual dexterity as "poor due to numbness in fingertips with markedly limited ability to type, word process, write." (*Id.*)

Dr. Lee also stated that McCready suffers from chronic pain.  (Compl. Ex. 2.)  Dr. Lee described McCready's chronic pain as present since the beginning of her diabetes and is related to peripheral neuropathy.  (*Id.*)  Although acute pain was not a problem as of April 15, 2003, Dr. Lee submitted that, "chronic debilitating pain persists."  (*Id.*)  McCready was therefore on increased doses of the pain medication Elavil.  (*Id.*)  Dr. Lee submitted that Ultram pain medication was discontinued once acute pain subsided, and that in his opinion, Ultram was inappropriate for long-term use for chronic pain.  (*Id.*)

Dr. Lee also submitted that McCready is limited in her ability to exert herself because her pulmonary function and capacity is poor.  (*Id.*)  Dr. Lee suggested that the reduced pulmonary function "limits her work tolerance and duration."  (*Id.*)

In his last report of April 15, 2003, Dr. Lee described McCready's continuing medical condition as follows:

> Blood sugars and diabetic control are improved; however, neuropathy has
> worsened.  This is typical of painful diabetic neuropathy of long duration, which
> can progress in pain despite improvement in blood sugar.  Pulmonary capacity has
> not improved significantly.  Sleep apnea work is in progress.

(Compl. Ex. 2.)  Dr. Lee further submitted that with concentration on managing her diabetes,

better diet, and an exercise plan, McCready was able to improve her blood sugars.  (*Id.*)  Dr. Lee

suggested this improvement was possible because McCready was not working at the time.  (*Id.*)

Dr. Lee ended his April 15, 2003 office visit notes stating that it was his medical opinion that

"McCready is clearly disabled to work at her previous job capacity."  (*Id.*)  Dr. Lee appended

those office visit notes on April 17, 2003 to state that "Mrs. McCready is unable to work at any

job capacity."  (*Id.*)

The records from Dr. Clouse ranged from August 21, 2001 to June 23, 2003.  (Compl.

Ex. 9 at p. 3-4.)  Those records noted pulmonary problems, hypertension, back pain, and diabetic

neuropathy and sleep apnea.  (*Id.*)   All conditions were being treated with various medications.

(*Id.*)  Dr. Clouse also noted it was difficult for McCready to walk without pain even in distances

of 200-300 feet.  (*Id.* p. 4.)  In his June 23, 2003 notes, Dr. Clouse noted that McCready was not

able to work or use her upper extremities because of diabetic neuropathy and chronic pain,

despite absence of motor weakness or symptoms of numbness and tingling in lower extremities.

(*Id.*)

Dr. Soriano provided records from September 19, 2001 to March 24, 2003.  (*Id.* at p.4-5.)

Despite more than a decade of asthma and emphysema, charts indicate a mild improvement in

respiratory function (95% oxygen saturation on initial consultation and 98% saturation on final

consultation).  (*Id.*)  On April 22, 2003, Dr. Soriano specified that McCready's lung disease

restricts her from "[w]ork which requires a significant amount of walking or climbing stairs or

any physically demanding occupation will likely cause more pulmonary difficulties." (Compl. Ex. 3.) Dr. Soriano also noted that it was difficult for McCready to walk because of back and leg pain. (Compl. Ex. 2. p. 5.)

On May 1, 2002, Dr. Scheerer provided one orthopedic treatment in response to shoulder pain. (*Id.* at p. 6.) After an injection to treat the pain, no follow-up visit occurred. (*Id.*) On January 27, 2003, Dr. Scholz conducted a visual test with no abnormal results. (*Id.*) Overall, blood pressure as reported by each doctor was within normal limits. (Compl. Ex. 9.)

ii.  Standard's Independent Medical Assessments

Mary Hosack, RN, conducted the initial review of McCready's medical file. (March 27, 2003, STND-00234). While Nurse Hosack noted multiple ongoing health problems, she noted that the same health problems were present while McCready was working at Piper, prior to submitting a claim for long-term disability. (*Id.*) She determined that McCready should be able to work in a sedentary to light occupation. (*Id.*) She also noted that some of McCready's conditions had improved prior to stopping work. (*Id.*)

As part of the QAU review process, Dr. Bradley J. Francher, Internal Medicine, reviewed McCready's file and determined that her respiratory ailments should not keep her from performing sedentary work. (Memo from Dr. Bradley J. Francher, STND-00281). Despite her weight problems, McCready has shown an ability to work at that weight in the past. (*Id.*) Hyperthyroidism and hypertension of which McCready complains should not cause occupational impairment. (*Id.*) The extent of documented diabetes and neuropathy does not indicate impairment. (*Id.*) While Dr. Francher concurred that obesity and neuropathy would make physical exertion difficult, he noted that McCready is receiving appropriate medical care and should be able to perform a completely sedentary occupation. (*Id.*)

14

Additionally, as part of the QAU process, Dr. Steven Beenson, Internal Medicine, reviewed McCready's medical records and provided the following opinion.  (Memo from Dr. Steven Beenson, STND-00325).  Dr. Beenson indicated that the medical record did not preclude McCready from sedentary employment, but she was permanently precluded from light work. (*Id.* at p. 3.)  Dr. Beenson further indicated that alternate pain treatment may be appropriate before considering McCready disabled.  (*Id.*)

III.  Other Benefits Received

Social Security made a favorable decision to provide McCready with disability benefits. (Compl. Ex. 10.)  The Social Security review determined that McCready "retained residual functional capacity to perform the exertional and non-exertional requirements of unskilled light work not requiring more than occasional standing/walking in an 8-hour day, or more than limited upper extremity hand manipulations.  (*Id.* at p. 3.)  The evaluator opined that work as a legal secretary requires "sedentary, skilled work, and required frequent hand manipulations."  (*Id.*)  As such, Social Security determined McCready was precluded from working as a legal secretary. (*Id.*)  Social Security then takes into account other factors in determining ultimate disability, including "age, education, work experience, and residual functional capacity."  (*Id.*)  The evaluator determined that with an "advanced age," high school education, and skilled work background, that McCready "has no transferrable work skills" and is disabled despite an ability to perform a full range of light work.  (*Id.* at p. 10-11.)[7]

SUMMARY JUDGMENT STANDARD

---

[7] McCready submits a letter from Hartford Life indicating an approved claim for waiver of premiums on her group life insurance policy on the grounds of permanent disability.  (Compl. Ex. 11.)  However, no explanation is provided of how "disability" is determined under the Hartford Life policy.

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Only disputed issues of material fact, as determined in reference to the governing substantive law, will affect entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

In a motion for summary judgment, this Court has "an affirmative obligation... to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).  In that context, a court is obligated to consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When both parties file motions for summary judgment, as here, the court applies the same standards of review. *Taft Broad. Co. v. United States,* 929 F.2d 240, 248 (6th Cir. 1991); *ITCO Corp. v. Michelin Tire Corp.,* 722 F.2d 42, 45 n.3 (4th Cir. 1983) ("The court is not permitted to resolve issues of material facts on a motion for summary judgment - - even where . . . both parties have filed cross motions for summary judgment.") (emphasis omitted), *cert. denied,* 469 U.S. 1215 (1985).  The role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard." *Towne Mgmt. Corp. v. Hartford Acc. & Indem. Co.,* 627 F. Supp. 170, 172 (D. Md. 1985).

<u>DISCUSSION</u>

16

I.  Standard of Review under ERISA

The standard of review under ERISA is affected by two initial determinations.  First, a Court must decide if the benefit plan grants the plan administrator discretion to determine benefit eligibility.  *Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264, 268 (4th Cir. 2002).  If a Court finds that discretion was granted, the Court must then determine if the plan administrator faced a conflict of interest[8] sufficient to reduce the deference normally afforded the administrator's decision.  *Id.* at 269.  From those two determinations, the Court establishes the appropriate standard of review to apply.

A.  Grant of Discretion to Plan Administrator

To grant discretion to a plan administrator, a benefit plan must do so explicitly and with clear language.  *Feder v. Paul Revere Life Ins. Co.*, 228 F.3d 518, 522 (4th Cir. 2000).  No specific words or phrases are required to grant discretion.  *See Gallagher*, 305 F.3d at 268.  Rather, "if the terms of a plan indicate a clear intention to delegate final authority to determine eligibility to the plan administrator, then this Court will recognize discretionary authority by implication."  *Feder*, 228 F.3d at 522.

This Court addressed this precise question in *Stills v. GBMC Healthcare, Inc.*, 48 F. Supp. 2d 495 (D. Md. 1999).  In that case, Standard administered the short-term disability plan.  In reviewing essentially identical language as in this instant case, this Court found that the "Allocation of Authority" section of a disability plan granted Standard discretionary authority to determine benefits eligibility where it reserved: "full and exclusive authority... to interpret the

---

[8] An administrator faces a conflict of interest where a decision to grant or deny benefits may consider the insurer's financial interests as it "both administers the plan and pays for benefits received by its members."  *Berstein v. CapitalCare, Inc.*, 70 F.3d 783, 788 (4th Cir. 1995).

Group Policy and resolve all questions arising in its administration, interpretation, and application," including "the right to determine ... entitlement to benefits." *Id.* at 498; *see also Snow v. Standard Ins. Co.*, 87 F.3d 327, 330 (9th Cir. 1996) (holding that a plan that grants authority to determine eligibility benefits confers discretion to the plan administrator).

In the instant case, Plaintiff's long-term disability Plan contains largely identical language to that in *Stills*. In Plaintiff's Plan, Standard provided an "Allocation of Authority" clause reserving discretionary authority to its plan administrator. (STND-00008) Specifically, the Plan states: "we have full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy." *Id.* The reserved authority explicitly includes "[t]he right to determine ... [e]ntitlement to benefits." *Id.* Accordingly, as articulated in *Stills* and as determined in this Court's Memorandum Opinion granting Defendant's Motion for Protective Order, Plaintiff's long-term disability Plan reserves discretion in the plan administrator over determination of disability benefits.

When a benefit plan reserves administrative discretion, an administrator's decision to grant or deny a claim is reviewed under an abuse of discretion standard.[9] *See Stills*, 48 F. Supp. 2d at 498; *Johannssen v. District No. 1-Pacific Coast District*, 292 F.3d 159, 168 (4th Cir. 2002); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989); *see also Doe v. Group Hosp.*, 3 F.3d 80, 85 (4th Cir. 1993); *Crosby v. Crosby*, 986 F.2d 79, 83 (4th Cir. 1993). Under a deferential standard, a Court will uphold the administrator's decision if it is reasonable, whether or not the Court may have reached a different conclusion. *See Feder*, 228 F.3d at 522; *Ellis v.*

---

[9] In contrast, where a plan does not clearly reserve discretion, the administrator's decision is reviewed *de novo*. *Feder*, 228 F.3d at 522.

*Metropolitan Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997).  A decision is reasonable where it is "the result of a deliberate, principled reasoning process and if it is supported by substantial evidence."  *Ellis*, 126 F.3d at 232 (citing *Brogan v. Holland*, 105 F.3d 158, 165 (4th Cir. 1997) (quoting *Bernstein v. CapitalCare, Inc.,* 70 F.3d 783, 788 (4th Cir. 1995))).

      B.  Effect of Conflict of Interest

In this case, Standard is both the plan administrator and the insurer responsible for paying McCready's long-term disability benefits.  *See Bernstein*, 70 F.3d at 788 (An administrator faces a conflict of interest where a decision to grant or deny benefits impacts the insurer's financial interests as it "both administers the plan and pays for benefits received by its members.").  When a plan administrator is delegated discretion, a conflict of interest in claim determination may reduce the deference a Court shows to the administrator's decisions.  *Gallagher*, 305 F.3d at 269 (citing *Ellis*, 126 F.3d at 233).  Where a Court determines a conflict exists, the abuse of discretion standard is reduced "to the degree necessary to neutralize any untoward influence resulting from the conflict."  *Ellis*, 126 F.3d at 233.  Deference is reduced on a sliding scale - - where the incentive to benefit the insurer over the beneficiary is greater, "the more objectively reasonable the administrator or fiduciary's decision must be and the more substantial the evidence must be to support it."  *Id.*  Accordingly, while this Court reviews Standard's administrative decision to deny benefits under an abuse of discretion standard, the reasonableness of Standard's decision and the weight of the evidence supporting that decision must be somewhat greater than under a simple abuse of discretion analysis.  *See Booth v. Wal-Mart Stores, Inc. Assoc. Health and Welfare Plan*, 201 F.3d 335, 344 (4th Cir. 2000).

II.  Standard's Process and Ultimate Decision to Deny McCready Long-Term Disability Benefits

It is undisputed that after three levels of review, Standard determined McCready was

ineligible to receive long-term disability benefits.  Standard determined that the "Material

Duties" of McCready's "Own Occupation," as defined under the long-term disability Plan, are

sedentary in nature.  Based on the sedentary nature of Legal Secretary and Secretary positions in

the general economy, Standard concluded that McCready's medical evidence was insufficient to

show that she was "Disabled" as defined by the Plan.  Rather, Standard found that McCready

was able to perform the essential, "Material Duties" of her "Own Occupation" as found in the

general economy.

Standard's process of review was both deliberate and principled and Standard kept

McCready apprized of her application status and promptly notified her of Standard's benefits

determinations.  Standard considered all medical evidence submitted by McCready, conducted a

vocational review of McCready's file, and procured an independent evaluation of the medical

evidence provided by McCready.  *See Ellis*, 126 F.3d at 233-34; *Booth*, 201 F. 3d at 344-34.

This Court will now review Standard's determination, under the appropriate standard of review

discussed above, to ensure that its decision was based on substantial evidence.  *See LeFebre v.*

*Westinghouse Elec. Corp.*, 747 F.2d 197, 208 (4th Cir. 1984), *overruled by implication on other*

*grounds by*, *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003) (noting that

substantial evidence, which consists of more than a mere scintilla of evidence but may be

somewhat less than a preponderance, "is evidence which a reasoning mind would accept as

sufficient to support a particular conclusion."); *see also United Seniors Ass'n v. Social Sec.*

*Admin.*, 423 F.3d 397, 404 (4th Cir. 2005).

A.  Determination of "Material Duties" and "Own Occupation"

In reaching its conclusion that McCready was not "Disabled" under the Plan, Standard

first determined the scope of McCready's "Own Occupation" under the Plan, which, as

previously noted, was not limited to her old position at Piper.  During the first two levels of its

review process, Standard relied on the descriptions provided by the DOT in the absence of any

detailed job description provided by McCready or her former employer.  After a description of

McCready's job was provided in June of 2003, Standard considered this information while

conducting its QAU review.

In particular, the Vocational Case Manager, Amy Williams, MA, CRC, assigned to

McCready's claim considered Piper's description of McCready's position as legal secretary.  Ms.

Williams, however, found that Piper's description of McCready's duties was in excess of the

DOT's description of Legal Secretary.  (STND 00301.)  As Piper's description of McCready's

duties required standing and walking for 135 hours a month, or approximately 80% of the work-

day, Standard found Piper's description inconsistent with McCready's position as found in the

general economy.  Standard determined that Piper's description was "well in excess of what

would commonly exist in a classically sedentary secretarial occupation," as outlined by the DOT

definitions of Legal Secretary and Secretary.  (STND 00300.)

McCready asserts that it was unreasonable for Standard to "reject out of hand the job

description provided in detail by Piper Rudnick." (Pl.'s Mot. Summ. J. at 17.)  However, the

administrative record before the Court does not indicate that Standard was thoughtlessly

dismissive of Piper's description of McCready's job.  Ms. Williams, a Vocational Case Manager,

considered Piper's description.  It was after examining the job description Piper provided that

Ms. Williams determined that it was in excess of a Legal Secretary/Secretary position in the

general economy, in part, because Piper's description noted a very high level of walking,

standing, and physical activity.

The United States Court of Appeals for the Fourth Circuit has previously found that it is

21

reasonable for an insurer to consider the DOT descriptions in order to define an applicant's occupation and job duties.  *See Gallagher*, 305 F.3d at 270-73; *see also Dionida v. Reliance Standard Life Ins. Co.*, 50 F. Supp. 2d 934, 939 n.4 (N.D. Cal. 1999) (stating that "the D.O.T. is widely and routinely used to define "occupation" in the U.S. economy . . .   Given the amount of research and analysis that has gone into grouping similar jobs and defining the occupational titles, and the length of time the D.O.T. has been widely used, it is reasonable for plan administrators, and courts, to use . . . ").  At the first two levels of review, Standard had no detailed job description from McCready or Piper and, therefore, it was certainly reasonable for Standard to look to the DOT classifications for guidance.

Furthermore, even though Piper did eventually submit a description of McCready's job at the firm, Standard is not bound by Piper's description in determining McCready's "Own Occupation" and "Material Duties" under the clear terms of the Policy.  The definition of "Own Occupation" under the Policy indicates that Standard is to evaluate McCready's position as Legal Secretary against professions of the same general character as McCready's position at Piper, *but not limited to her job with Piper*.[10]  The definition of "Own Occupation" under the plan, therefore, reasonably contemplates the definition of McCready's profession as Legal Secretary/Secretary as found in the general economy.  As a result, there is no evidence that Ms. Williams' analysis, reference to DOT definitions, or classification of McCready's "Own Occupation" as sedentary constituted an abuse of discretion.

---

[10]   "Own Occupation" is defined as:

any employment, business, trade, profession, calling or vocation that involves Material Duties of the same general character as your regular and ordinary employment with the Employer.  **Your Own Occupation is not limited to your job with your Employer**.  (Compl. Ex. 6 p. 6) (emphasis added).

McCready asserts that a statement in a Memorandum written by Sandra Bertha in Standard's QAU serves as an admission that Standard unreasonably ignored Piper's description of McCready's position.  In requesting an independent medical opinion during the QAU review of McCready's file, Ms. Bertha drafted a Memorandum, on June 27, 2003, that posed four areas of inquiry for which she sought to obtain a medical opinion.  Those areas of inquiry included references to both "sedentary work" and "sedentary to light work."  (STND 00297.)  The first line of Ms. Bertha's Memorandum, however, noted that McCready "formerly worked as a Legal Secretary, *which is sedentary work*, but *may* involve some light work activities."  (STND 00297) (emphasis added).  Ms. Bertha's Memorandum, which was written before Ms. Williams concluded her vocational analysis on July 2, 2003, indicated that Standard sought to undertake a thorough additional review of McCready's claim.  The Memorandum was a request for medical evaluation and not a determination that McCready's "Own Occupation" or "Material Duties" should be classified as requiring "sedentary to light work", as Ms. Williams was still in the process of conducting her vocational review.  Quite simply, Bertha's Memorandum does not "illustrate[] the substantial bias and inconsistency in decision-making for which no deference should be afforded", as Plaintiff claims.  (Pl.'s Mot. Summ. J. at 18.)

Standard's determination that McCready's "Own Occupation" and "Material Duties" as defined under the Plan are sedentary in nature was not an abuse of discretion and its determination was supported by substantial evidence.  Standard's consideration of McCready's statements, Piper's job description, and DOT definitions demonstrate a principled and reasoned analysis.  As a result, this Court finds that Standard did not abuse its discretion in defining McCready's "Own Occupation" and "Material Duties" based on the information presented to it and based on the clear and unambiguous definitions contained in the Policy.

## B.  Plaintiff's Physical Limitations to Performing "Material Duties" of "Own Occupation"

To qualify for long-term disability benefits, McCready must submit satisfactory proof that she was unable to perform the "Material Duties" of her "Own Occupation."  *See Elliott v. Sara Lee Corp.*, 190 F.3d 601, 603 (4th Cir. 1999) (noting that the burden of proving a disability is placed on the employee).  As McCready's "Own Occupation" is determined to be sedentary as found in the general economy, McCready's medical evidence must indicate that she is unable to perform the requirements of a sedentary secretarial occupation.  There is no material dispute over the medical evidence; McCready has numerous medical ailments that limit her mobility, endurance, and comfort.  The record also reflects that McCready's medical conditions were stable throughout the period of analysis.  However, the medical evidence does not indicate that McCready would be unable to perform a sedentary occupation.  Accordingly, Standard did not abuse its discretion in denying McCready's long-term disability benefits.

As McCready indicates in her Opposition to Defendant's Motion for Summary Judgment and in her Cross Motion for Summary Judgment, Standard does not dispute the medical records submitted by McCready's doctors.  (Pl.'s Mot. Summ. J. at p. 8.)  Standard thoroughly considered and evaluated the statements made by McCready's physicians in light of the Plan's requirements for a determination of disability.[11]  Through its review, Standard determined that

---

[11] In her Opposition Memorandum and in her Cross Motion for Summary Judgment, McCready cites to *Dunbar v. Orbital Sciences Corp. Group Disability Plan*, 265 F. Supp. 2d 572 (D. Md. 2003), to support the proposition that Standard clearly abused its discretion in denying McCready's claim for long-term disability.  (Pl.'s Mot. Summ. J. at p. 10.)  McCready's assertion is that Standard unduly disregarded statements made by her physicians as to her health and ability to work.  What McCready's assertion fails to recognize, however, is that, unlike the defendant in *Dunbar*, Standard did not disregard McCready's medical evidence.  This Court, therefore, finds *Dunbar* unpersuasive because the facts presented in *Dunbar* are clearly distinguishable from the facts *sub judice*.

the substantial evidence, viewed as a whole, indicated that McCready could perform a sedentary secretarial occupation as found in the general economy and required by the definition of "Own Occupation" under the Plan.

McCready disputes Standard's conclusions regarding the implications of her medical records on several grounds. In particular, McCready disputes Standard's reliance on the whole record without deference to Dr. Lee's April 17, 2003 amendment stating that McCready was unable to perform any occupation.[12]  (STND 00258.)  Standard does not have to rely on McCready's treating physician's statements alone, or Dr. Lee's determinations specifically, but may consider other medical evidence in its determination of disability.  *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003) (holding that ERISA requirements "do not command plan administrators to credit the opinions of treating physicians over other evidence relevant to the claimant's medical condition.").  As such, Dr. Lee's conclusory statement in his amended notes dated April 17, 2003 that McCready is "unable to work at any job capacity" is not conclusive of her disability under the Plan.  (STND 00258.)

Moreover, the Fourth Circuit decision in *Gallagher v. Reliance Standard Life Insurance, Co.* explains that where a benefits applicant's medical evidence is inconsistent or incomplete, other evidence is helpful in providing an accurate evaluation of a patient's condition.  *See Gallagher*, 305 F.3d at 273-74.  In *Gallagher*, Gallagher performed three to four hours of sedentary work and some international travel as a corporate officer and publisher.  305 F.3d at 267.  Gallagher suffered from back pain that required surgery which improved, but did not

---

[12] It is interesting to note that Dr. Lee initially wrote that McCready was disabled from her previous occupation after examining her on April 15, 2003.  On April 17, 2003 Dr. Lee amended his report, without indication of further medical information, to indicate that McCready was disabled from any occupation.  (STND 00258.)

remedy, the problem and eventually Gallagher's pain became "severe." *Id.* at 267-68. Having

determined through DOT definitions that Gallagher worked in a sedentary capacity, Reliance

asked various doctors to evaluate Gallagher's ability to perform the duties outlined by the DOT.

*Id.* at 272-73.

The Fourth Circuit in *Gallagher* concluded that notes indicating an opinion by

Gallagher's doctor that work impeded his health improvements did not prove disability and were

inconclusive. *Id.* at 274. Gallagher's doctor opined that "Gallagher's resignation was a good

decision because 'his hectic schedule was only slowing down his progress [from chiropractic

treatment.]'" *Id.* The Fourth Circuit found that such a statement did not suggest an inability to

perform occupation duties, but rather that working slowed down medical improvement. *Id.*

Similarly, notes in McCready's medical records indicated that her condition improved absent

work do not show that Standard erred in concluding that she was not disabled under the Plan.

Although there may be indications in McCready's medical records noting pain and

discomfort, such notations did not necessitate a finding by Standard of disability under the

Policy when she had worked with similar levels of pain and discomfort in the past. In the

*Gallagher* case, the Fourth Circuit noted that chronic back pain required Gallagher to endure

more than two decades of significant pain and discomfort. *Id.* However, Gallagher had

performed at least some of his occupational duties throughout that period of time. *Id.*

Furthermore, there was no medical evidence suggesting that Gallagher's pain became more

severe at the time he claimed disability, but rather that there was some indication of marginal

improvement. *Id.* Citing the ability to perform occupational duties before resignation from his

position and no medical evidence of a worsening of his medical condition, the Fourth Circuit

concluded that Gallagher did not provide sufficient evidence to meet the definition of disability under the plan.[13]  *Id.* at 275.

In sum, the medical evidence available does not suggest Standard abused its discretion by determining that McCready is able to perform the "Material Duties" of her "Own Occupation" as defined under the Plan.  Standard's decision was supported by substantial evidence and was made with deliberate and principled reasoning, as it reviewed McCready's medical records and sought opinions from independent sources.  Therefore, based on the undisputed facts, this Court will not disturb Standard's decision to deny McCready long-term benefits under the Plan based on the information contained in her medical records.

## III.  Relevance of Social Security Disability Benefit Determination

McCready also argues that Standard abused its discretion in denying her long-term disability benefits because she received favorable determinations granting benefits through the Social Security Administration (the "SSA") and a private group life insurance plan.[14]  (Compl. ¶ 28.)  SSA determinations of disability are based on different standards than those under independent long-term disability plans like the Standard Plan at issue in this case.  In *Gallagher v. Reliance*, the Fourth Circuit found SSA evaluations inapposite as Reliance's plan defined disability differently than the SSA.  *See Gallagher*, 305 F.3d at 275.  As the SSA standard

---

[13] Although the *Gallagher* court evaluated a disability plan with a slightly different definition of disability from the Standard Plan at issue here, this Court finds the Fourth Circuit's decision and reasoning highly relevant and informative.  Both the factual issues and assertions made in the instant case are directly considered and resolved in *Gallagher*.  This Court therefore finds that the reasoning in *Gallagher* is appropriately applied here, and plan definitions of disability need not be identical to lead to a similar result.

[14] McCready argues that The Hartford Group Life Insurance Policy determination to grant her claim for Waiver of Premium Benefits due to disability indicates that Standard abused its discretion in denying her claim to long-term disability benefits under the Standard Plan.  (Compl. Ex. 11; Compl. ¶ 29.)  There is no information provided with respect to the Hartford's determination for eligibility for waiver under the terms of its policy.  The Hartford's determination is in no way binding upon Standard in its disability determination.

differed from the definition of disability under the Plan, the court found "no obligation to weigh the agency's disability determination more favorably than other evidence." *Id.* (citing *Elliott*, 190 F.3d at 607). Moreover, SSA regulations provide that greater weight will be given to medical opinions from treating physicians. *See Black & Decker Disability Plan*, 538 U.S. at 829 (citing to CFR §§ 404.1527(d)(2), 416. 927(d)(2) (2002)). A preference for treating physicians' opinions is not found under ERISA; rather, the Supreme Court explicitly rejected that requirement for plans such as the one reviewed in this case. *Id.* at 834.

In the instant case, the SSA considered evidence of various treating physicians to determine that McCready would be able to perform light work. (Compl. Ex. 10. p. 3.) Specifically, the SSA found that McCready "retained the residual functional capacity to perform the exertional and non-exertional requirements of unskilled light work not requiring more than occasional standing/walking in an 8-hour day, or more than limited upper extremity hand manipulations." (*Id.*) The SSA determined that McCready's position as a legal secretary required sedentary, skilled labor with frequent hand manipulations. (*Id.*) In addition to McCready's "residual functional capacity," the SSA also considered McCready's age, education, and work experience to determine if she possessed transferrable work skills to another occupation. (*Id.*) Considering all of these factors, the SSA determined that despite McCready's capacity to perform a "full range of light work," her age, education and work experience render her "disabled." (*Id.* at 4.) The SSA's determination, however, does not support McCready's assertion that Standard's denial was an abuse of discretion as "[t]here is no indication that the definition of [disability] under the Plan in any way mirrors the relevant definition under the regulations of the SSA." *Elliott*, 190 F.3d at 607. Quite simply, the SSA determination is not

dispositive in this case.  Standard did not abuse its discretion in reaching a different decision than the one reached by SSA.

<u>CONCLUSION</u>

For the reasons stated above, Defendant's Motion for Summary Judgment is GRANTED and Plaintiff's Motion for Summary Judgment is DENIED.  A separate Order and Judgment will follow.


Dated:  March 1 , 2006                                     /s/_____
                                                                     Richard D. Bennett
                                                                     United States District Judge